## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| STEVEN PAUL JARVIS, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| XPLR INFRASTRUCTURE, LP f/k/a NEXTERA ENERGY PARTNERS, LP, JOHN W. KETCHUM, JAMES L. ROBO, BRIAN W. BOLSTER, TERRELL KIRK CREWS II, and REBECCA J. KUJAWA, | |
| Defendants. | |

Plaintiff, Steven Paul Jarvis ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding XPLR Infrastructure, LP ("XPLR" or the "Company") f/k/a NextEra Energy Partners, LP ("NextEra Energy Partners" or "NEP"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired XPLR securities between January 26, 2021, and January 27, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      XPLR acquires, owns, and manages contracted clean energy projects in the U.S., including a portfolio of contracted renewable generation assets consisting of wind, solar, and battery storage projects.  The Company also owns contracted natural gas pipeline assets.  The Company changed its name from "NextEra Energy Partners, LP" to "XPLR Infrastructure, LP" in January 2025.

3.      Throughout the Class Period, XPLR operated as a "yieldco"—that is, a business that owns and operates fully built and operational power generating projects, focused on delivering large cash distributions to investors.  Following the failures of other high-profile yieldcos, XPLR was one of the last remaining yieldcos on the market.  Indeed, the Company maintained its yieldco business model while championing its ability to do so, consistently increasing the amount of its cash distributions to investors throughout the Class Period.  In addition, from January 2021 to September 2023, XPLR continually asserted that it expected 12% to 15% per year growth in limited partner distributions as being a reasonable range of expectations through at least 2024.

4.      Key to XPLR's (temporary) survival as a yieldco were the various private convertible equity portfolio financing ("CEPF") arrangements to which it was a party.  Under these CEPF arrangements, the Company would issue convertible securities, such as convertible notes or convertible debt, to large investors, which would later convert into equity in the Company based on a specified triggering event, such as automatically converting upon the CEPF's maturity date.  To avoid these triggering events, the Company would need to exercise its option to purchase, or buy out, the outstanding equity interests in each CEPF.  In return for entering into a CEPF, XPLR received new equity capital, which it used to support its acquisition of additional cash-generating assets, thereby increasing its cash flows and, ultimately, its cash distribution to its unitholders.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) XPLR was struggling to maintain its operations as a yieldco; (ii) Defendants temporarily relieved this issue by entering into CEPF arrangements while downplaying the attendant risks; (iii) XPLR could not buy out CEPFs before their maturity date without risking significant unitholder dilution; (iv) as a result, Defendants planned to halt cash distributions to investors and instead redirect those funds to, *inter alia*, buy out the Company's CEPFs; (v) as a result of all the foregoing, XPLR's yieldco business model and distribution growth rate was unsustainable; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6.      On April 25, 2023, KeyBanc Capital Markets ("KeyBanc") cut its recommendation on XPLR to sector weight from overweight, citing "impending equity dilution in an unfavorable financial landscape."  KeyBanc's downgrade focused on XPLR's CEPF

arrangements, expressing  concern "that upcoming conversions would create a medium-term overhang in the higher capital cost environment[.]"  Accordingly, KeyBanc concluded that although XPLR "has several levers it can pull to fund growth and continue to deliver on its 12%-15% DPU [distribution per unit] growth target, we think that overcoming circularity in the cost of capital/dilution equation in the current market is likely to be challenging, even for a premier developer like [XPLR]."

7.      On this news, XPLR's unit price fell $3.78 per unit, or 6.33%, to close at $55.94 per unit on April 26, 2023.

8.      On September 27, 2023, XPLR issued a press release announcing that it "is revising its limited partner distribution per unit growth rate to 5% to 8% per year through at least 2026, with a target growth rate of 6%."

9.      On this news, XPLR's unit price fell $9.44 per unit, or 20.13%, to close at $37.46 per unit on September 27, 2023.  XPLR's unit price continued to fall an additional $16.46 per unit, or **43.94%**, over the following **six** consecutive trading sessions on unusually high trading volume, eventually closing at $21.00 per unit on October 5, 2023.

10.      On November 9, 2023, Seaport Global Securities ("Seaport") downgraded XPLR units to sell from neutral with a $15.50 price target, having determined that the Company's revised cash distribution outlook was still likely too high.  Seaport further predicted that a "dividend cut should become clear in Q1 2024," while citing "growing unease" over the Company's financing structure.

11.      On this news, XPLR's unit price fell $3.07 per unit, or 11.35%, to close at $23.99 per unit on November 9, 2023.

12.     Then, on January 28, 2025, XPLR issued a press release announcing that it was abandoning its yieldco business model and indefinitely suspending its cash distribution to unitholders, stating it would redirect those funds to execute on several priorities, the first of which was to buy out its remaining CEPF obligations.  The same press release also revealed that the Company had appointed a new chief executive officer ("CEO").

13.     On a subsequent conference call that XPLR hosted with investors and analysts the same day, Defendants further revealed, *inter alia*, that the Company was revamping its entire management team and had appointed a new chief financial officer ("CFO").

14.     Following these disclosures, XPLR's unit price fell $3.97 per unit, or 25.13%, to close at $11.83 per unit on January 28, 2025.  XPLR's unit price continued to fall an additional $1.39 per unit, or 11.75%, over the following two consecutive trading sessions, to close at $10.44 per unit on January 30, 2025.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  XPLR is headquartered in this District, Defendants

conduct business in this District, and a significant portion of Defendants' actions took place within this District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.     Plaintiff, as set forth in the attached Certification, acquired XPLR securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21.     Defendant XPLR is a Delaware corporation with principal executive offices located at 700 Universe Boulevard, Juno Beach, Florida 33408.  During the Class Period, XPLR's common units traded in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbols "NEP" and "XIFR."

22.     Defendant John W. Ketchum ("Ketchum") served as XPLR's CEO from March 1, 2022, to January 27, 2025.  Defendant Ketchum has also served as chairman of the Company's Board of Directors (the "Board") since July 29, 2022.

23.     Defendant James L. Robo ("Robo") served as XPLR's CEO from before the start of the Class Period to March 1, 2022.  Defendant Robo also served as chairman of the Board from before the start of the Class Period to July 29, 2022.

24.     Defendant Brian W. Bolster ("Bolster") served as XPLR's CFO from May 6, 2024, to January 27, 2025.

25.     Defendant Terrell Kirk Crews II ("Crews") served as XPLR's CFO from March 1, 2022, to May 6, 2024.

26.     Defendant Rebecca J. Kujawa ("Kujawa") served as XPLR's CFO from before the start of the Class Period to March 1, 2022.

27.     Defendants Ketchum, Robo, Bolster, Crews, and Kujawa are collectively referred to herein as the "Individual Defendants."

28.     The Individual Defendants possessed the power and authority to control the contents of XPLR's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of XPLR's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with XPLR, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

29.     XPLR and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

30.     XPLR acquires, owns, and manages contracted clean energy projects in the U.S., including a portfolio of contracted renewable generation assets consisting of wind, solar, and battery storage projects.  The Company also owns contracted natural gas pipeline assets.

31.     Throughout the Class Period, XPLR operated as a yieldco.  Under this business model, XPLR would periodically sell equity in the Company to generate funds to acquire attractive clean energy generation assets with predictable, stable cash flows under long-term contracts, and then distribute a large portion of those cash flows to investors in the form of dividends.

32.     Yieldcos emerged in the early 2010s as an attractive, low-risk financial vehicle for investors.  By acquiring fully built and operational power generating projects, yieldcos avoided risks typically associated with investments in other companies with energy generation projects still under development.  Accordingly, yieldcos provided a steady stream of predictable cash flows while avoiding risks associated with potential increased costs and delays related to project development.  By mid-2015, yieldcos had significantly declined in popularity, with prominent yieldcos failing under the weight of their own debt and either filing for bankruptcy or being acquired.

33.     Following the failures of other high-profile yieldcos, XPLR was one of the last remaining yieldcos on the market.  The Company maintained its yieldco business model while championing its ability to do so, consistently increasing its cash distributions to investors over the course of its operations until the end of the Class Period.  Indeed, the Company's ability to consistently grow its cash distributions was of major, if not primary, concern to investors given the past failures of other prominent yieldcos.

34.     However, XPLR faced a major obstacle with maintaining its cash distribution growth rate; the Company was caught in a vicious cycle of needing to acquire more and more lucrative assets to increase cash flows to consistently increase cash distributions to investors.  To acquire additional cash-generating assets to consistently increase cash distributions, the

Company needed to issue increasing amounts of equity to raise sufficient capital to purchase those additional cash-producing assets. Given the declining investor interest in yieldcos, however, the Company had no choice but to issue equity at lower prices to generate funds to purchase assets to increase cash flows and, ultimately, its cash distributions, leading to significant unitholder dilution.

35.     XPLR found a temporary solution to this conundrum by entering into multiple private CEPF arrangements. Under these CEPF arrangements, the Company would issue convertible securities, such as convertible notes or convertible debt, to large investors, which would later convert into equity in the Company based on a specified triggering event, such as automatically converting upon the CEPF's maturity date. To avoid these triggering events, the Company would need to exercise its option to purchase, or "buy out," the outstanding equity interests in each CEPF. In return for entering into a CEPF, XPLR received new equity capital, which it used to support its acquisition of additional assets, thereby increasing its cash flows and, ultimately, its cash distribution to its unitholders. As a result, the Company could avoid raising funds through equity issuances, and thereby fund its acquisition of additional cash-producing assets without having to first dilute its units.

**Materially False and Misleading Statements Issued During the Class Period**

36.     The Class Period begins on January 26, 2021, when XPLR issued a press release during pre-market hours announcing its fourth quarter and full year 2020 financial results (the "4Q/FY20 Earnings Release"). The 4Q/FY20 Earnings Release quoted Defendant Robo as stating, in relevant part:

> For 2020, NextEra Energy Partners grew limited partner unitholder distributions by 15% year-over-year and delivered a 40% year-over-year CAFD [cash available for distribution] growth, highlighting the strength and diversity of its long-term contracted clean energy portfolio. NextEra Energy Partners delivered an attractive

total unitholder return of approximately 32% in 2020, further advancing its history of value creation since its initial public offering in 2014 . . . . With significant expected long-term renewables growth, combined with the strength of the partnership's existing portfolio and continued access to approximately $2.4 billion in available financing capacity under the corporate revolving credit facility and commitments from investors in potential [CEPF] arrangements, we continue to believe NextEra Energy Partners remains uniquely positioned to take advantage of the disruptive factors reshaping the energy industry.

37.    In addition, the 4Q/FY20 Earnings Release touted that XPLR's Board had

"declared a quarterly distribution of $0.6150 per common unit (corresponding to an annualized

rate of $2.46 per common unit) to the unitholders of NextEra Energy Partners[,]" representing

"grow[th of] approximately 15% on an annualized basis versus the fourth quarter of 2019"; while

also touting XPLR's acquisition of interests in additional renewable energy assets financed with

an approximate $1.1 billion CEPF, stating, in relevant part:

> During the fourth quarter of 2020, NextEra Energy Partners completed the acquisition of a 40% interest in an approximately 1,000-megawatt (MW) renewables portfolio and a 100% interest in an approximately 100-MW solar-plus-storage project from a subsidiary of NextEra Energy Resources, LLC. As part of this transaction, NextEra Energy Partners entered into an approximately $1.1 billion [CEPF], which includes the acquired assets plus four existing NextEra Energy Partners' wind and solar projects. In conjunction with closing on the acquisition from NextEra Energy Resources, NextEra Energy Partners drew approximately $750 million of the $1.1 billion convertible equity portfolio financing. A second draw of approximately $350 million is expected to occur in 2021, with proceeds available for future growth and general corporate purposes.

The foregoing statements clearly indicated to investors that XPLR could and would maintain its

yieldco business model and increase cash distributions to unitholders while funding acquisitions

through CEPF arrangements, particularly when read in conjunction with Defendant Robo's

statements as referenced in ¶ 36, *supra*, which likewise touted XPLR's sustainable cash

distribution growth rate and financing through CEPF arrangements.

38.    Moreover, in discussing XPLR's distribution outlook through at least 2024, the

4Q/FY21 Earnings Release represented, in relevant part, that "[f]rom an updated base of its

fourth-quarter 2020 distribution per common unit at an annualized rate of $2.46 per common

unit, NextEra Energy Partners continues to expect 12% to 15% per year growth in limited partner

distributions as being a reasonable range of expectations through at least 2024[.]"

39.     On February 16, 2021, XPLR filed an annual report on Form 10-K with the SEC,

reporting the Company's financial and operating results for the quarter and year ended December

31, 2020 (the "2020 10-K").  The 2020 10-K touted the sustainability of XPLR's yieldco

business model, stating, *inter alia*, that XPLR "believes its cash flow profile, . . . operational

excellence and cost-efficient business model . . . enable [it] to execute its business strategy[,]" a

key component of which was purportedly to "*[m]aintain a sound capital structure and financial

flexibility*" by "utiliz[ing] various financing structures including limited-recourse project-level

financings, the sale of differential membership interests and equity interests in certain

subsidiaries, preferred units, convertible senior unsecured notes and senior unsecured notes, as

well as revolving credit facilities and term loans."  (Emphasis in original).

40.     Likewise, the 2020 10-K stated that XPLR's "cash flow profile, its credit rating,

the long-term nature of its contracts and its ability to raise capital provide flexibility for

optimizing its capital structure and increasing distributions"; and that the Company "intends to

continually evaluate opportunities to finance future acquisitions or refinance its existing debt and

seeks to limit recourse, optimize leverage, hedge exposure, extend maturities and increase cash

distributions to common unitholders over the long term."

41.     Similarly, the 2020 10-K asserted that XPLR would sustainably "*[g]row [its]

business and cash distributions through selective acquisitions of ownership interests in operating

projects or projects under construction*" by "maintaining a disciplined investment approach[,]"

11

"which it believes will enable it to increase cash distributions to its common unitholders over the long term."  (Emphasis in original).

42.     The 2020 10-K further asserted that XPLR "is well-positioned to execute its strategy and increase cash distributions to its common unitholders over the long term based on . . . competitive strengths" including, *inter alia*, "operational excellence, cost-efficient operations and reliability."

43.     Appended as exhibits to the 2020 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Robo and Kujawa certified that the 2020 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

44.     On January 25, 2022, XPLR issued a press release announcing its fourth quarter and full year 2021 financial results (the "4Q/FY21 Earnings Release").  The 4Q/FY21 Earnings Release quoted Defendant Robo as stating, in relevant part, that XPLR "delivered a total unitholder return of approximately 30% in 2021, bringing its two-year total unitholder return up to more than 72% and further advancing its history of value creation since its initial public offering," while touting the Company's purported "ability to leverage [*inter alia*] . . . low-cost sources of capital . . . to be successful in third-party acquisitions."

45.     In addition, the 4Q/FY21 Earnings Release touted that the Company's Board had "declared a quarterly distribution of $0.7075 per common unit (corresponding to an annualized

rate of $2.83 per common unit) to the unitholders of NextEra Energy Partners[,]" representing

"grow[th of] approximately 15% on an annualized basis versus the fourth quarter of 2020"; while

also touting XPLR's "[c]omplet[ion of] multiple low-cost financings, including [the] lowest-cost

[CEPF] and lowest-cost project-level financing in the partnership's history"; thereby indicating

to investors that the Company could and would maintain its yieldco business model and increase

distributions to unitholders while funding acquisitions through CEPF arrangements.

46.     Moreover, in discussing XPLR's distribution outlook through at least 2024, the

4Q/FY21 Earnings Release represented, in relevant part, that "[f]rom an updated base of its

fourth-quarter 2021 distribution per common unit at an annualized rate of $2.83 per common

unit, NextEra Energy Partners continues to expect 12% to 15% per year growth in limited partner

distributions as being a reasonable range of expectations through at least 2024[.]"

47.     On February 23, 2022, XPLR filed an annual report on Form 10-K with the SEC,

reporting the Company's financial and operating results for the quarter and year ended December

31, 2021 (the "2021 10-K").  The 2021 10-K contained the same statements as referenced in ¶¶

39-42, *supra*, touting the sustainability of XPLR's yieldco business model and purported sound

capital structure.

48.     Appended as exhibits to the 2021 10-K were substantively the same SOX

certifications as reference in ¶ 43, *supra*, signed by Defendants Robo and Kujawa.

49.     On January 25, 2023, XPLR issued a press release announcing its fourth quarter

and full year 2022 financial results (the "4Q/FY22 Earnings Release").  The 4Q/FY22 Earnings

Release highlighted that XPLR had "[g]row[n] distributions per unit approximately 15% year-

over-year"; "[c]omplete[d] several accretive acquisitions and low-cost financings to support

growth"; and "extend[ed its projection of] 12% to 15% distribution per unit growth by an

additional year, through 2026, off an updated 2022 base[,]" purportedly "[d]riven by long-term

growth visibility[.]"

50.     The 4Q/FY22 Earnings Release also quoted Defendant Ketchum as stating, *inter*

*alia*:

> We continue to believe NextEra Energy Partners is extremely well positioned with
> ample liquidity to finance future growth and to capture a meaningful share of the
> long-term opportunity set in renewables, which has significantly expanded as a
> result of the Inflation Reduction Act. This significant opportunity set and NextEra
> Energy Partners' meaningful financing flexibility provide us with confidence in our
> ability to continue to deliver long-term value for unitholders over the coming years.
> Based on our long-term growth visibility, we are extending our 12% to 15%
> distribution per unit growth expectations through 2026. We believe NextEra
> Energy Partners' distribution per unit growth expectations are best-in-class versus
> any other company of its kind in the market and the combination of the
> partnership's clean energy portfolio, growth visibility and financing flexibility
> offers limited partner unitholders a uniquely attractive investor value proposition.

51.     In addition, the 4Q/FY22 Earnings Release touted that the Company's Board had

"declared a quarterly distribution of $0.8125 per common unit (corresponding to an annualized

rate of $3.25 per common unit) to the unitholders of NextEra Energy Partners[,]" representing

"grow[th of] approximately 15% on an annualized basis versus the fourth quarter of 2021"; while

also touting XPLR's purported "execut[ion of] several low-cost financings in 2022" and

"significant financing flexibility[,]" including "a new [CEPF] for approximately $900 million

with a low implied cash coupon of roughly 2.8% for up to 10 years"; thereby indicating to

investors that the Company could and would maintain its yieldco business model and increase

distributions to unitholders while funding acquisitions through, *inter alia*, CEPF arrangements.

52.     Moreover, in discussing XPLR's distribution outlook through at least 2026, the

4Q/FY22 Earnings Release represented, in relevant part, that "[f]rom an updated base of its

fourth-quarter 2022 distribution per common unit at an annualized rate of $3.25, NextEra Energy

Partners now sees 12% to 15% growth per year in limited partner distributions per unit as being a

14

reasonable range of expectations through at least 2026, which is one additional year beyond prior expectations, driven by the partnership's long-term growth visibility."

53.     On February 23, 2023, XPLR filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2022 (the "2022 10-K").  The 2022 10-K contained the same statements as referenced in ¶¶ 39-42, *supra*, touting the sustainability of XPLR's yieldco business model and purported sound capital structure.

54.     Appended as exhibits to the 2022 10-K were substantively the same SOX certifications as reference in ¶ 43, *supra*, signed by Defendants Ketchum and Crews.

55.     On April 3, 2023, XPLR issued a press release "announc[ing] that during the first quarter of 2023 it exercised its option (the buyout right) to purchase 25% of the outstanding minority equity interest in its 2019 STX Midstream [CEPF] from a fund managed by EIG, an institutional investor to the global energy sector, subject to post-closing covenants."  That press release assured investors that, notwithstanding XPLR's sale of millions of its common units to fund this transaction, the Company's yieldco model and distribution growth rate remained stable, stating, in relevant part:

> NextEra Energy Partners completed as of March 31, 2023, its first exercise of its buyout right under the agreement for aggregate cash consideration of approximately $200 million. To pay its purchase price, NextEra Energy Partners used proceeds of approximately $150 million from its sale of 2.3 million common units under its at-the-market equity issuance program with the balance being funded through a planned draw on the subsidiary's revolving credit facility. The sale of the 2.3 million common units represents less than 3% of NextEra Energy Partners' public float, and less than 5% of the average daily trading volume based on the number of available trading days in the quarter. In addition, it represents approximately three days of trading volume for NextEra Energy Partners units.
>
> **Outlook and financing flexibility**
> From a base of its fourth-quarter 2022 distribution per common unit at an annualized rate of $3.25, NextEra Energy Partners continues to see 12% to 15%

growth per year in limited partner distributions per unit as being a reasonable range of expectations through at least 2026.

* * *

NextEra Energy Partners had approximately $3 billion available liquidity as of Dec. 31, 2022. NextEra Energy Partners expects to continue to have significant financing capacity and ample liquidity for growth. Additionally, NextEra Energy Partners continues to have $6 billion of forward-starting interest rate swaps, providing significant interest-rate protection on near-term maturities as well as supporting future growth.

(Emphasis in original.)

56.     On May 8, 2023, XPLR issued a press release announcing, *inter alia*, its "[p]lans to sell natural gas pipeline assets and use proceeds to complete all planned buyouts of [CEPF]s through 2025" (the "May 2023 Press Release").  Rather than disclose that XPLR's yieldco business model was unsustainable, the May 2023 Press Release asserted that this decision was part of a purported larger plan to "concentrate solely on growing its high-quality renewable energy portfolio, capitalizing on the low-cost nature of renewables and the significant capital investment needed to decarbonize the U.S. economy"; and that, "[t]o execute on this vision, NextEra Energy Partners will focus on its core strengths, eliminate a significant amount of near-term [CEPF] obligations, reduce equity needs and simplify and recapitalize the business, all of which are intended to deliver long-term unitholder value."

57.     The May 2023 Press Release also quoted Defendant Ketchum as stating, in relevant part:

We have a terrific track record, but we believe NextEra Energy Partners' future growth potential is not reflected in its current valuation. We believe this disconnect is driven by a combination of macroeconomic factors and concerns around the equity required to finance the partnership's [CEPF] buyouts. Today, we are announcing plans to simplify the partnership's capital structure and singularly focus on a 100% renewable energy strategy. The U.S. economy's ongoing transition to renewable energy is a significant driver of future renewable energy investments,

16

and we want NextEra Energy Partners to be well positioned to capitalize on these investments.

[]To lead this transition, we are launching a process to sell our natural gas pipeline assets and we are suspending incentive distribution rights fees to NextEra Energy through 2026. These actions would both increase our renewable energy investments and eliminate the equity issuance that would otherwise be required to complete all three [CEPF] buyouts planned for 2023, 2024 and 2025[.]

58.     The May 2023 Press Release also assured investors that XPLR "continues to see 12% to 15% growth per year in limited partner distributions per unit as being a reasonable range of expectations through at least 2026[,]" while simultaneously touting its "plan to capitalize on the clean energy transition[,]" including, *inter alia*, "launching a process to sell its STX Midstream and Meade natural gas pipeline assets in 2023 and 2025, respectively" and using "the excess proceeds . . . to buy out the STX Midstream, 2019 NEP Pipelines and NEP Renewables II [CEPF]s."  These statements clearly indicated to investors that the Company could and would maintain its yieldco business model and increase cash distributions to unitholders while addressing the Company's CEPF obligations.

59.     The statements referenced in ¶¶ 36-58 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) XPLR was struggling to maintain its operations as a yieldco; (ii) Defendants temporarily relieved this issue by entering into CEPF arrangements while downplaying the attendant risks; (iii) XPLR could not buy out CEPFs before their maturity date without risking significant unitholder dilution; (iv) as a result, Defendants planned to halt cash distributions to investors and instead redirect those funds to, *inter alia*, buy out the Company's CEPFs; (v) as a result of all the foregoing, XPLR's yieldco

business model and distribution growth rate was unsustainable; and (vi) as a result, Defendants'

public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

60.     On April 25, 2023, during after-market hours, KeyBanc cut its recommendation

on XPLR to sector weight from overweight, citing "impending equity dilution in an unfavorable

financial landscape."  KeyBanc's downgrade focused on XPLR's CEPF arrangements,

expressing  concern "that upcoming conversions would create a medium-term overhang in the

higher capital cost environment[.]"  Accordingly, KeyBanc concluded that although XPLR "has

several levers it can pull to fund growth and continue to deliver on its 12%-15% DPU growth

target, we think that overcoming circularity in the cost of capital/dilution equation in the current

market is likely to be challenging, even for a premier developer like [XPLR]."

61.     On this news, XPLR's unit price fell $3.78 per unit, or 6.33%, to close at $55.94

per unit on April 26, 2023.

62.     On September 27, 2023, during pre-market hours, XPLR issued a press release

announcing that it "is revising its limited partner distribution per unit growth rate to 5% to 8%

per year through at least 2026, with a target growth rate of 6%" (the "September 2023 Press

Release").  The September 2023 Press release further stated, in relevant part:

> By reducing its growth rate and executing on its previously announced transition
> plans as outlined in May, which includes the sale of the natural gas pipelines and
> the buyouts of the [CEPF] payments due through 2025, NextEra Energy Partners
> does not expect to require growth equity to meet its revised growth expectations
> until 2027.
>
> * * *
>
> NextEra Energy Partners now expects the annualized rates of its third-quarter 2023
> distribution per common unit to be $3.47, payable in November 2023, and its
> fourth-quarter 2023 distribution per common unit to be $3.52, payable in February
> of 2024.

63.     The market immediately and severely reacted to this news.  For example, as reported by *Bloomberg*, following XPLR's issuance of the September 2023 Press Release, its units fell to their lowest price in three years, with trading volume on the Company's units spiking "to more than 32 times the 20-day average for this time of day."  Specifically, following XPLR's issuance of the September 2023 Press Release, its unit price fell $9.44 per unit, or 20.13%, to close at $37.46 per unit on September 27, 2023.

64.     *Bloomberg* also reported that, between September 27 and September 28, 2023, XPLR's "lower[ed] outlook prompted two downgrades for the stock and five price target cuts as Wall Street sees higher interest rates hurting [XPLR] shares[,]" with, *inter alia*, Oppenheimer & Co. cutting its recommendation on XPLR to market perform from outperform; J.P. Morgan cutting its recommendation to neutral from overweight; Mizuho Securities Co. Ltd. cutting its price target ("PT") to $40 from $86; BMO Capital Markets cutting its PT to $47 from $76; Guggenheim Securities ("Guggenheim") cutting its PT to $42 from $74; and Raymond James cutting its PT to $50 from $60.

65.     Following this slew of analyst downgrades and PT cuts, as well as additional analyst downgrades and PT cuts over the following days, XPLR's unit price continued to fall an additional $16.46 per unit, or ***43.94%***, over the following ***six*** consecutive trading sessions on unusually high trading volume, eventually closing at $21.00 per unit on October 5, 2023.

66.     Then, on November 9, 2023, during pre-market hours, Seaport downgraded XPLR units to sell from neutral with a $15.50 price target, having determined that the Company's revised distribution outlook was still likely too high, stating that "the recent sale of Texas pipelines, short-term interest rate hedges and wind project repowering won't be enough to continue NEP's 6% annual growth."  Seaport further predicted that a "dividend cut should

become clear in Q1 2024 when the yieldco [XPLR] refinances $1.25B in maturing debt at 7.3%-plus vs. 2.5% currently," citing "growing unease" over the Company's financing structure.

67.     On this news, XPLR's unit price fell $3.07 per unit, or 11.35%, to close at $23.99 per unit on November 9, 2023.

68.     Despite these declines in XPLR's unit price, the Company's securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the sustainability of XPLR's yieldco business model and cash distributions.

69.     For example, on January 25, 2024, XPLR issued a press release announcing its fourth quarter and full year 2023 financial results (the "4Q/FY23 Earnings Release"). The 4Q/FY23 Earnings Release quoted Defendant Ketchum as stating, in relevant part, that following XPLR's "successfully completed . . . sale of its Texas natural gas pipeline portfolio [it] has sufficient proceeds available to address the equity buyouts of the STX Midstream and NEP Renewables II [CEPF]s."

70.     In addition, the 4Q/FY23 Earnings Release touted that the Company's Board had "declared a quarterly distribution of $0.88 per common unit (corresponding to an annualized rate of $3.52 per common unit) to the unitholders of NextEra Energy Partners[,]" "reflect[ing] an annualized increase of 6% from its third-quarter 2023 distribution per common unit"; while also touting that "the [completed] sale of the Texas pipeline portfolio . . . has addressed two of the three near-term [CEPF]s" and that XPLR "has plans to address the third [CEPF] associated with the Meade pipeline in 2025." These statements indicated to investors that XPLR could and would maintain its yieldco business model and distributions to unitholders while addressing its CEPF obligations.

71.     Moreover, in discussing XPLR's distribution outlook through at least 2026, the 4Q/FY23 Earnings Release represented, in relevant part, that "[f]rom an updated base of its fourth-quarter 2023 distribution per common unit at an annualized rate of $3.52, NextEra Energy Partners continues to see 5% to 8% growth per year in limited partner distributions per unit, with a current target of 6% growth per year, as being a reasonable range of expectations through at least 2026."

72.     In this same regard, the 4Q/FY23 Earnings Release represented that XPLR "expects its [cash distribution] payout ratio to be in the mid-90s through 2026."

73.     On February 21, 2024, XPLR filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K").  The 2023 10-K contained substantively the same statements as referenced in ¶¶ 39-42, *supra*, which, although toning down statements regarding XPLR's commitment to distribution growth, nonetheless continued to tout the sustainability of XPLR's yieldco business model and purported sound capital structure, while stressing XPLR's commitment to take actions to continue delivering cash distributions to unitholders.

74.     Appended as exhibits to the 2023 10-K were substantively the same SOX certifications as reference in ¶ 43, *supra*, signed by Defendants Ketchum and Crews.

75.     On October 23, 2024, XPLR hosted a conference call with investors and analysts, wherein Defendant Bolster touted that XPLR's Board had "declared a quarterly distribution of $0.9175 per common unit or $3.67 per common unit on an annualized basis, up nearly 6% from a year earlier" despite the Company's "continue[d] . . . evaluat[ion of] alternatives to address its remaining [CEPF] obligations and its cost of capital," thereby indicating to investors that the

Company could and would maintain its yieldco business model and cash distributions to unitholders while addressing its CEPF obligations.

76.      On the same call, Defendant Bolster also stated that XPLR "intends to provide its distribution and run rate cash available for distribution expectations" "by no later than [its] fourth quarter 2024 [earnings] call" without disclosing that the Company had planned, or was at least considering, to abandon its yieldco business model and suspend its cash distributions to unitholders.

77.      The statements referenced in ¶¶ 69-76 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) XPLR was struggling to maintain its operations as a yieldco; (ii) Defendants temporarily relieved this issue by entering into CEPF arrangements while downplaying the attendant risks; (iii) XPLR could not buy out CEPFs before their maturity date without risking significant unitholder dilution; (iv) as a result, Defendants planned to halt cash distributions to investors and instead redirect those funds to, *inter alia*, buy out the Company's CEPFs; (v) as a result of all the foregoing, XPLR's yieldco business model and distribution growth rate was unsustainable; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

78.      On January 28, 2025, during pre-market hours, XPLR issued a press release announcing its fourth quarter and full year 2024 financial results (the "4Q/FY24 Earnings Release").  Therein, XPLR revealed that it was abandoning its yieldco structure and indefinitely suspending its distribution to unitholders, stating, in relevant part:

**XPLR Infrastructure, LP announces strategic repositioning**
- Moving from an acquisition and distribution model to a business that invests its retained cash flows in its existing assets and other attractive investments
- Suspending its distribution to common unitholders for an indefinite period, facilitating a business plan that does not include any equity issuance
- All [CEPF] buyout payments are expected to be paid in cash

\* \* \*

XPLR . . . is moving from a business model that focused almost entirely on raising new capital to acquire assets while distributing substantially all of its excess cash flows to unitholders to a model in which XPLR Infrastructure utilizes retained operating cash flows to fund attractive investments. Accordingly, XPLR Infrastructure is announcing the suspension of distributions to unitholders for an indefinite period. By taking these actions today, XPLR Infrastructure adopts a plan that eliminates the need for equity issuances.

\* \* \*

**Repositioning its capital allocation model**
XPLR Infrastructure plans to allocate its capital to the following opportunities:
- <u>Fund cash buyout of selected [CEPF]s</u>. XPLR Infrastructure expects to buy out selected [CEPF]s to produce double-digit unitholder returns.
- <u>Invest in XPLR Infrastructure's existing assets</u>. XPLR Infrastructure expects to make investments in opportunities at double-digit unitholder returns related to its existing assets, including wind repowering and battery storage opportunities across its approximately 10-gigawatt (GW) renewable portfolio.
- <u>Explore additional growth opportunities</u>. XPLR Infrastructure plans to evaluate investments in clean energy assets that can generate double-digit unitholder returns.
- <u>Return capital to unitholders, including common unit buybacks</u>. XPLR Infrastructure will measure future investment opportunities against returning capital to unitholders.

**Addressing financing for all [CEPF]s**
Today, XPLR Infrastructure has five [CEPF]s in place. XPLR Infrastructure intends to buy out three of these portfolios by the end of 2027. At the end of 2027, XPLR Infrastructure expects to have only two remaining [CEPF]s outstanding. XPLR Infrastructure has worked collaboratively with the investor in one of the two remaining [CEPF]s to create the option to restructure the approximately $1 billion buyout payment due in 2030 into smaller distributed payments through 2034 allowing XPLR Infrastructure to fund buyouts in that timeframe from cash flow. Following today's repositioning, XPLR Infrastructure believes it has a path to address all of the [CEPF]s which does not require additional equity issuances.

(Emphases in original.)

79.     In addition, the 4Q/FY24 Earnings Release revealed that XPLR had appointed

Alan Liu ("Liu") as its new CEO.

80.     The same day, also during pre-market hours, XPLR hosted a conference call with

investors and analysts to discuss the Company's fourth quarter and full year 2024 results and

abandonment of its yieldco model (the "4Q/FY24 Earnings Call").  During his prepared remarks

on the 4Q/FY24 Earnings Call, Defendant Bolster discussed the events leading up to XPLR's

decision to abandon its yieldco model, stating, in relevant part:

> When XPLR was established in 2014, we expected its basic function to be to
> acquire contracted clean energy assets and to hold those assets in a portfolio that
> delivered relatively low risk and growing cash flows. Other opportunities for
> growth, of course, were not ruled out, but this was expected to be the main path to
> growth, at least for some years.
>
> Explicit in this model of growth driven by acquisitions was the commitment to
> payout a very high proportion of annual cash flows, which necessarily meant that
> every new acquisition was would bring with it a need for new equity issuances. For
> many years this model worked. However, as distributions per unit grew, the
> partnership needed to acquire more assets and thus issue more equity to support its
> distribution growth rate.
>
> As our equity needs grew, the existing public equity market for yieldcos proved to
> be more limited, creating the need for substantial discounting and thus increased
> dilution. Therefore, we looked to private capital as a financing source to help
> support our growing equity needs and maintain our distribution growth rate.
>
> When issued, the CEPF offered new equity capital to support acquisitions.
> Unfortunately, as we began to buyout CEPF obligations by issuing equity in 2021,
> there was significant downward selling pressure on the unit price. If we had
> continued to issue equity to buyout to CEPFs, it would have resulted in significant
> dilution to unitholders. Over this time, it has become clear that utilizing the
> significant cash available to XPLR to fund these buyouts instead of distributing that
> cash and issuing new equity results in what we believe is a better economic value
> proposition for unitholders over the longer term.

81.     Defendant Bolster also revealed that, "[i]n the context of a dynamic capital allocation model, XPLR will be putting a new management team in place," to "be led by Alan Liu,"  including its appointment of Jessica Geoffroy as the Company's new CFO.

82.     During his prepared remarks on the 4Q/FY24 Earnings Release, Liu also stressed the importance of buying out the Company's CEPF obligations, stating, in relevant part:

> The first priority is funding the cash buyout options of selected CEPFs. We expect the buyout of selected CEPFs to produce double-digit returns, allowing us to retain ownership of assets we believe will provide attractive opportunities well into the future.
>
> We expect the buyout of these investments will also simplify our capital structure by eliminating friction costs such as change of control restrictions and make whole payments which can limit strategic flexibility.

83.     The foregoing disclosures shocked the market.  As reported in one of several *Bloomberg* articles addressing XPLR that day, the Company had just recently "paid out 91.75 cents per unit to investors in November[,]" noting that the Company's cash distribution suspension "marked ***the first time the company had cut or suspended its distribution***, according to a representative[,]" and "[c]onsensus expectations had been for a 34% cut[.]"  (Emphasis added.)  In other words, while the market had anticipated a cut to XPLR's cash distribution, it had been unprepared for a complete suspension of that distribution, all at once, after XPLR's consistent history of consecutively raising its cash distribution, despite its CEPF obligations.  The same day, *Seeking Alpha* reported that "XPLR Infrastructure [had] plunge[d] to all-time low after suspending distributions[.]"

84.     Indeed, following Defendants' revelations in the 4Q/FY24 Earnings Release and 4Q/FY24 Earnings Call, XPLR's unit price fell $3.97 per unit, or 25.13%, to close at $11.83 per unit on January 28, 2025.  XPLR's unit price continued to fall an additional $1.39 per unit, or

11.75%, over the following two consecutive trading sessions, to close at $10.44 per unit on January 30, 2025.

85.     Between January 28, 2025, and February 3, 2025, XPLR faced a slew of analyst downgrades and PT cuts.  For example, Morgan Stanley double-downgraded XPLR to underweight from overweight and cut its PT to $13.00 from $22.00, calling the Company's recent strategic update "disappointing" and "f[a]ll[ing] short of a resolution that could clearly articulate the value proposition for equity investors going forward."  Likewise, Evercore ISI cut its PT to $15.00 from $30.00, noting that, although some investors were hoping for a partial distribution cut, they had also hoped that Company management would have found "other solutions to guide to moderated distribution growth from there with a heightened focus on CAFD per share growth going forward."  In addition, Barclays cut its PT to $7.00 from $17.00; UBS cut its PT to $12.00 from $20.00; Guggenheim cut its PT to $12.00 from $17.00; J.P. Morgan cut its PT to $13.00 from $20.00; and Jefferies cut its PT to $15.00 from $25.00.

86.     As of the filing of this Complaint, XPLR's unit price trades around $9.00 per share—a nearly *90%* decline from its highest Class Period closing price of $87.69 per unit on November 24, 2021.

87.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### Regulation S-K Items 105 and 303

88.     Throughout the Class Period, XPLR's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"),

required XPLR to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered."  Defendants' failures to disclose, *inter alia*, that XPLR's yieldco business model was unsustainable and, accordingly, Defendants planned to abandon that business model, violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

89.      For similar reasons, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failures to disclose, *inter alia*, that XPLR's yieldco business model was unsustainable and, accordingly, Defendants planned to abandon that business model, violated Item 303 because these issues represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

## SCIENTER ALLEGATIONS

90.      During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired XPLR securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

92.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, XPLR securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by XPLR or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

93.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

94.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

95.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of XPLR;

- whether the Individual Defendants caused XPLR to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of XPLR securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

96.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

97.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- XPLR securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold XPLR securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

98.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

99.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

### **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

100.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

101.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

102.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the

other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of XPLR securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire XPLR securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

103.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for XPLR securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about XPLR's finances and business prospects.

104.    By virtue of their positions at XPLR, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants

were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

105.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of XPLR, the Individual Defendants had knowledge of the details of XPLR's internal affairs.

106.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of XPLR.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to XPLR's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of XPLR securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning XPLR's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired XPLR securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

107.    During the Class Period, XPLR securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of XPLR securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of XPLR securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of XPLR securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

108.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

109.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

110.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

111.    During the Class Period, the Individual Defendants participated in the operation and management of XPLR, and conducted and participated, directly and indirectly, in the conduct of XPLR's business affairs.  Because of their senior positions, they knew the adverse

non-public information about XPLR's misstatement of income and expenses and false financial statements.

112.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to XPLR's financial condition and results of operations, and to correct promptly any public statements issued by XPLR which had become materially false or misleading.

113.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which XPLR disseminated in the marketplace during the Class Period concerning XPLR's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause XPLR to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of XPLR within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of XPLR securities.

114.    Each of the Individual Defendants, therefore, acted as a controlling person of XPLR.  By reason of their senior management positions and/or being directors of XPLR, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, XPLR to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of XPLR and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

115.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by XPLR.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 10, 2025                              Respectfully submitted,

                                                  **MILLER SHAH LLP**

                                                  By: */s/ Jayne A. Goldstein*
                                                  Jayne A. Goldstein
                                                  Nathan C. Zipperian
                                                  2103 N. Commerce Parkway
                                                  Ft. Lauderdale, FL 33326
                                                  Telephone: (954) 515-0123
                                                  Facsimile: (866) 300-7367
                                                  jagoldstein@millershah.com
                                                  nczipperian@millershah.com

                                                  **POMERANTZ LLP**
                                                  James M. LoPiano
                                                  (*pro hac vice* application forthcoming)
                                                  600 Third Avenue, 20th Floor
                                                  New York, New York 10016
                                                  Telephone: (212) 661-1100
                                                  Facsimile: (917) 463-1044
                                                  jlopiano@pomlaw.com

*Attorneys for Plaintiff*

Docusign Envelope ID: E939E7B9-4D1A-4921-82EF-CE311FAB443F

## CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.    I, <u> Steven Paul Jarvis                             </u>, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against XPLR Infrastructure, LP f/k/a NextEra Energy Partners, LP ("XPLR") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire XPLR securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired XPLR securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in XPLR securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** <u>2/10/2025</u>

      **(Date)**

DocuSigned by:

*Steven Jarvis*

E3D2EA454896427...

**(Signature)**

Steven Paul Jarvis

**(Type or Print Name)**

**XPLR Infrastructure, LP (f/k/a NextEra Energy Partners, LP) (XIFR)**          **Steven Paul Jarvis**

**List of Purchases/Acquisitions and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 8/19/2022 | 236 | $77.0100 |
| Purchase/Acquisition | 2/7/2024 | 35 | $25.4400 |
| Purchase/Acquisition | 9/25/2024 | 182 | $26.4900 |
| Purchase/Acquisition | 12/26/2024 | 47 | $17.8300 |